**FIFTH DIVISION**
**MERCIER, C. J.,**
**MCFADDEN, P. J., and RICKMAN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 4, 2024**

# In the Court of Appeals of Georgia

A24A0404. MILLER v. POLK et al.

MCFADDEN, Presiding Judge.

This case is a part of the litigation that arose from the death on an operating table of appellant Calvin Miller's wife, Jerline Miller. Before us today, for the second time, is Calvin Miller's appeal from an order granting partial summary judgment to Dr. Marcus Polk and two companies of which he is the principal. As explained in the margin, we do not distinguish between those two companies and generally refer to them collectively as "the companies."[1]

---

[1] Miller filed his lawsuit naming as defendants Marcus Polk and "Anesthesia Consultants of Georgia, LLC d/b/a Oracle Anesthesia of Georgia." (Miller also named another individual as a defendant, but that individual is not involved in this appeal.) The record indicates that Anesthesia Consultants of Georgia, LLC and Oracle Anesthesia of Georgia, LLC are separate entities owned by Polk.

In a previous appeal in this case, we observed that, "counsel did not suggest

Miller argues that Dr. Polk and the companies are liable for negligent credentialing. The credentials at issue are those of certified registered nurse anesthetist ("CRNA") Cynthia Hamm. Hamm was an independent contractor supplied by the companies. She was present when appellant's deceased was scheduled to undergo the subject procedure.

The trial court concluded that, individually and collectively, the companies "serve[ ] as a staffing company that supplies anesthesia providers to hospitals and medical facilities." . Although Dr. Polk is an anesthesiologist, , he had no role in the subject procedure other than through the companies. The trial court held that Dr. Polk and the companies had no credentialing duty. We agree.

Miller makes two other arguments which we must reject without substantive analysis. He argues that the trial court erred by holding that the defendants' alleged

that any distinctions between the entities [were] relevant to [that] appeal[.]" *Miller v. Polk*, 363 Ga. App. 771, 772 n.1 (872 SE2d 754) (2022). So we did "not distinguish between the entities in [the] opinion." Id. We directed the parties to raise any such issues on remand to the trial court. Id.

In their brief in support of their post-remand summary judgment motion, the defendants identified themselves as Polk, Oracle Anesthesia of Georgia, LLC, and Anesthesia Consultants of Georgia, LLC, and stated that they had been improperly named, but they did not raise this alleged misnomer as a ground entitling them to any relief.

violation of certain statutes did not amount to negligence per se. But he has failed to point to evidence of any violation of a statute. Miller argues that the trial court erred by granting summary judgment on his claim that the defendants failed to report the CRNA's misconduct. But he has abandoned this enumeration by failing to support it with argument.

So we affirm the trial court's grant of partial summary judgment to Dr. Polk and the companies.

1. *Factual and procedural background*

"We review de novo a grant or denial of summary judgment, viewing the evidence and all reasonable conclusions and inferences drawn from it in the light most favorable to the nonmovant." *Miller v. Polk*, 363 Ga. App. 771, 775 (872 SE2d 754) (2022).

So viewed, the record shows that Dr. Polk owns both Anesthesia Consultants of Georgia, LLC and Oracle Anesthesia of Georgia, LLC. The companies provide licensed anesthesia professionals to ambulatory surgical centers that perform out-patient surgical procedures that require anesthesia services. The companies enter professional service agreements with licensed anesthesiologists and CRNAs, whom

they assign to the ambulatory surgical centers with which the companies have contracts.

CRNA Cynthia Hamm entered a professional services agreement with both Anesthesia Consultants and Oracle Anesthesia. Oracle Anesthesia had entered a contract to assign anesthesia providers to Pain Care Center of Georgia, and from 2015 to 2019, Oracle Anesthesia assigned Hamm to Pain Care Center of Georgia to provide anesthesia services.

Appellant's deceased, Jerline Miller, was scheduled to undergo a procedure with a physician from Pain Care Center of Georgia to relieve back pain. Hamm was present to provide anesthesia services during the scheduled procedure.

Before the procedure began, Jerline Miller was administered a sedative and a prophylactic antibiotic. While she was prone on the operating table, she began coughing and stated that she was having trouble breathing. Hamm performed a chin lift jaw thrust, a movement performed when breathing is obstructed. The medical team turned Jerline Miller onto her back and unsuccessfully began life saving efforts. Emergency medical services transported Jerline Miller to a hospital, where she died

4

the next day. Her procedure at Pain Care Center of Georgia had been aborted with no incision having been made.

Miller filed a lawsuit that alleged negligence on the part of the medical professionals who were in the operating room when Jerline Miller died. The defendants in that action were Hamm, the physician who intended to perform the scheduled procedure, Pain Care Center of Georgia, and others. Miller settled that lawsuit. See *Miller v. Polk*, 363 Ga. App. at 774.

He filed this separate action against Polk and Anesthesia Consultants of Georgia, LLC d/b/a Oracle Anesthesia of Georgia, alleging claims for negligence, professional negligence, and corporate negligence; claims for imputed and vicarious liability for Hamm's alleged negligence; a claim for negligent hiring, credentialing, and retention; a claim for negligence per se; and a claim for failing to report Hamm's alleged misconduct. Miller sought damages, punitive damages, and attorney fees.

The defendants moved for summary judgment, and the trial court granted the motion on most of those claims. Miller then filed his first appeal to this court.

As to the claims for negligent credentialing and the derivative claims for punitive damages and attorney fees, we reversed and remanded. *Miller v. Polk*, 363 Ga.

App. 771, 778-780 (3) (a) & 782 (7) (872 SE2d 754) (2022). We directed the parties on remand to address the question of "whether a negligent credentialing claim may lie against an entity such as [the companies] (which, on the current record, does not appear to be a hospital, clinic, or similar medical facility) or its owner." Id. at 780 (3) (a) (iii).

We affirmed the grant of summary judgment to the defendants on Miller's claims based on imputed or vicarious liability, *Miller v. Polk*, 363 Ga. App. at 777 (1) (d), and corporate liability, id. at 778-778 (2) (b); his claims for negligent hiring, retention, training, and supervision, id. at 781 (3) (b); and his claim for professional negligence (or, more particularly, as we noted in the opinion, medical malpractice) against Polk. Id. at 782 (5).

We noted that the trial court had not addressed three of Miller's claims against Anesthesia Consultants of Georgia, LLC d/b/a Oracle Anesthesia — his claims for medical malpractice, negligence per se, and the negligent failure to report Hamm's alleged misconduct. So those claims remained pending before the trial court. *Miller v. Polk*, 363 Ga. App. at 782 (6).

6

On remand, the defendants again moved for summary judgment. The trial court denied the defendants' motion for summary judgment on Miller's claim for medical malpractice against Anesthesia Consultants of Georgia, LLC d/b/a Oracle Anesthesia, but granted the defendants' motion on Miller's claims for negligent credentialing, negligence per se, and failure to report alleged misconduct. The court also granted summary judgment to Polk, but not to Anesthesia Consultants of Georgia, LLC d/b/a Oracle Anesthesia, on Miller's claims for punitive damages and attorney fees. Miller filed this appeal.

2. *Negligent credentialing*

Miller argues that the trial court erred by granting summary judgment to the defendants on his negligent credentialing claim, disputing the trial court's determination that they had no duty to credential Hamm. We agree with the trial court.

"Whether a duty exists upon which liability can be based is a question of law." *City of Rome v. Jordan*, 263 Ga. 26, 27 (1) (426 SE2d 861) (1993). The duty of care "can arise either from a valid legislative enactment, that is, by statute, or be imposed

7

by a common law principle recognized in the case law." *Diamond v. Dept. of Transp.*, 326 Ga. App. 189, 194 (2) (756 SE2d 277) (2014) (citation and punctuation omitted).

The duty upon which Miller relies for his negligent credentialing claim is a duty recognized in the case law. In *Mitchell County Hosp. Auth. v. Joiner*, 229 Ga. 140 (189 SE2d 412) (1972), our Supreme Court held that "a [h]ospital [a]uthority operating a public hospital has authority to examine the qualifications of any physician seeking staff privileges and to limit his practice to those areas in which he is deemed qualified to practice or to completely bar him from such practice if he is incompetent, unqualified, inexperienced or reckless." Id. at 142. So, the court concluded, a plaintiff could hold a hospital authority liable based on its "independent negligence in permitting the alleged negligent physician to practice his profession in the hospital, when his incompetency is known." Id. at 141.

This court later held that "a hospital has a direct and independent responsibility to its patients to take reasonable steps to ensure that staff physicians using hospital facilities are qualified for privileges granted." *McCall v. Henry Med. Center*, 250 Ga. App. 679, 681 (1) (551 SE2d 739) (2001) (citation and punctuation omitted). See also *Candler Gen. Hosp. v. Persaud*, 212 Ga. App. 762, 766 (2) (442 SE2d 775) (1994) ("a

hospital has a direct and independent responsibility to its patients to take reasonable steps to ensure that staff physicians using hospital facilities are qualified for privileges granted") (physical precedent only). So "[i]t follows that a cause of action for negligent credentialing of staff physicians and other medical care providers is an independent cause of action that arises out of that responsibility." *Ladner v. Northside Hosp.*, 314 Ga. App. 136, 138 n.4 (723 SE2d 450) (2012). We have held that the duty also applies to the credentialing and granting of privileges to nurses. *Wellstar Health Systems v. Green*, 258 Ga. App. 86, 88 (1) (572 SE2d 731) (2002) (affirming the partial grant of summary judgment to a plaintiff who asserted a claim against a health care institution for the negligent credentialing of a nurse practitioner who was not properly licensed, noting that "[a] cause of action for negligent credentialing is an independent cause of action arising out of a health care institution's direct responsibility to its patients to take reasonable steps to ensure that medical care providers are qualified").

These negligent credentialing cases establish that the responsibility to credential doctors and nurses arises from the health care institution's duty to its patients. The cases describe the duty as the health care institution's responsibility to ensure that the individual medical care providers using its facilities to provide medical care to patients

are qualified for the privileges granted by the health care institution. This accords with provisions in our Code regarding the regulation of hospitals and related institutions, such as ambulatory surgical centers like Pain Care Center of Georgia. See OCGA § 31-7-1 (4) (C) (including ambulatory surgical treatment centers in the definition of "institution" for purposes of Title 31, Article 1 concerning the regulation of hospitals and related institutions). Specifically, OCGA § 31-7-15 (a) (3) provides:

> A[n] ambulatory surgical center shall provide for the review of professional practices in the . . . ambulatory surgical center for the purpose of reducing morbidity and mortality and for the improvement of the care of patients in the . . . ambulatory surgical center. This review shall include, but shall not be limited to, . . . [t]he evaluation of medical and health care services or the qualifications and professional competence of persons performing or seeking to perform such services.

Paragraph (e) of the statute provides that, "Nothing in this or any other Code section shall be deemed to require any hospital or ambulatory surgical center to grant medical staff membership or privileges to any licensed practitioner of the healing arts." OCGA § 31-7-15 (e). In other words, the health care institution has the authority to decide whether or not to grant privileges to licensed medical practitioners. Our Supreme Court has held that the broad language of this statute "encompass[es] the

credentialing process[.]" *Hosp. Auth. of Valdosta and Lowndes County v. Meeks*, 285 Ga. 521, 524 (678 SE2d 71) (2009). In keeping with the requirements of the statute, the contract between Pain Care Center of Georgia and the appellee companies provides that Pain Care Center had the right to determine whether a medical care provider had clinical privileges at its facility.

From this we conclude that to succeed on a claim for negligent credentialing, a plaintiff must prove, among other things, that the defendant is a health care institution and that the plaintiff was a patient of that health care institution. Pretermitting whether Miller has provided evidence that Jerline Miller was a patient of the defendants, he has not demonstrated that the defendants, individually or collectively, are a health care institution.

We find support in our Code for this conclusion. OCGA § 31-7-1 includes the following definitions for the purpose of the regulation of hospitals and related institutions:

(4) "Institution" means:

(A) Any building, facility, or place in which are provided two or more beds and other facilities and services that are used for persons received for examination, diagnosis, treatment, surgery, maternity care, nursing

care, assisted living care, or personal care for periods continuing for 24 hours or longer and which is classified by the department, as provided for in this chapter, as either a hospital, nursing home, assisted living community, or personal care home;

(B) Any health facility wherein abortion procedures under subsections (b) and (c) of Code Section 16-12-141 are performed or are to be performed;

(C) Any building or facility, not under the operation or control of a hospital, which is primarily devoted to the provision of surgical treatment to patients not requiring hospitalization and which is classified by the department as an ambulatory surgical treatment center;

(D) Any fixed or mobile specimen collection center or health testing facility where specimens are taken from the human body for delivery to and examination in a licensed clinical laboratory or where certain measurements such as height and weight determination, limited audio and visual tests, and electrocardiograms are made, excluding public health services operated by the state, its counties, or municipalities;

(E) Any building or facility where human births occur on a regular and ongoing basis and which is classified by the department as a birthing center;

(F) Any building or facility which is devoted to the provision of treatment and rehabilitative care for periods continuing for 24 hours or longer for persons who have traumatic brain injury, as defined in Code Section 37-3-1; or

(G) Any freestanding imaging center where magnetic resonance imaging, computed tomography (CT) scanning, positron emission tomography (PET) scanning, positron emission tomography/computed tomography, and other advanced imaging services as defined by the department by rule, but not including X-rays, fluoroscopy, or ultrasound services, are conducted in a location or setting not affiliated or attached to a hospital or in the offices of an individual private physician or single group practice of physicians and conducted exclusively for patients of that physician or group practice.

The term "institution" shall exclude all physicians' and dentists' private offices and treatment rooms in which such physicians or dentists primarily see, consult with, and treat patients.

(5) "Medical facility" means any licensed general hospital, destination cancer hospital, or specialty hospital, institutional infirmary, public health center, or diagnostic and treatment center.

OCGA § 31-7-1. The record contains no evidence that the defendants fall into any of these defined categories or that the appellee companies have ever provided

"examination, diagnosis, treatment, surgery, maternity care, nursing care, assisted living care, or personal care" for any patients. OCGA § 31-7-1 (4) (A).

Miller argues, without citation to the record, that the defendants "are a healthcare entity that is granted privileges to treat the patients of their affiliated hospitals and Ambulatory Surgery Centers and the patients of their respective insurance company." Again without citation to the record, Miller argues that the defendants provided anesthesia services to Jerline Miller. But the record shows that the defendants assigned anesthesia professionals, such as Hamm, to the health care institutions with which they had contracts and that those health care institutions treated patients. Our review of the record has not disclosed any evidence that Anesthesia Consultants of Georgia, LLC d/b/a Oracle Anesthesia or Polk in his capacity as principal provided medical care to patients.

Miller argues that the defendants had a duty to credential Hamm because they are a direct pay beneficiary of Medicare-Medicaid. Miller cites no statute that imposes such a duty. He generally cites 42 USC §§ 1395-1395ccc. But he does not cite any provision in that Title that addresses a credentialing duty. Neither paragraph of the

14

only statute Miller specifically cites, 42 USC § 1395x (s) (2) (K) (ii) & (s) (2) (L), concerns a credentialing duty.

Miller attempts to establish a duty through expert testimony. Those efforts "fail because what duty a defendant owes is a question of legal policy to be decided as an issue of law. Because the existence of a legal duty is a question of law, an expert's testimony does not, and cannot, create a legal duty where none existed before." *Diamond*, 326 Ga. App. at 195 (2) (citations and punctuation omitted).

Because Miller has not pointed to evidence that the defendants are a health care institution, he has not demonstrated that the defendants had a duty to credential Hamm.

### 3. *Negligence per se*

Miller argues that the defendants violated OCGA §§ 43-26-51 and 43-26-53, that these violations amount to negligence per se, and so that the trial court erred in granting summary judgment on his negligence per se claim. That argument fails because Dr. Polk and the companies are not subject to those statutes and because Miller has not introduced evidence of an incident that a person who is subject to them would be required to report.

15

OCGA § 43-26-51 provides:

> A nurse shall report names of subject individuals to the board if the nurse has reasonable cause to believe that any other nurse has violated any of the grounds for discipline provided for in Code Section 43-26-53. A nurse need not duplicate a report if he or she has reasonable cause to believe that such report has been made to the board. A licensed health care professional shall not be required to report a nurse to the board under this Code section as a result of professional knowledge obtained in the course of the health care professional-patient relationship when the nurse is the patient.

Neither Polk nor Anesthesia Consultants of Georgia, LLC d/b/a Oracle Anesthesia is a nurse, so by its terms, this statute does not apply to the defendants.

OCGA § 43-26-53 lists specific incidents that "shall be reported to the [Georgia] [B]oard [of Nursing]. . ..." Paragraph (a) (7) describes the following reportable incident:

> While holding a license as a nurse, [a person is] convicted of any felony, crime involving moral turpitude, or crime violating a federal or state law relating to controlled substances or dangerous drugs in the courts of this state, any other state, territory, or country, or in the courts of the United States, including, but not limited to, a plea of nolo contendere entered to the charge[.]

OCGA § 43-26-53 (a) (7). Paragraph (a) (8) describes the following reportable incident:

> While holding a license as a nurse, [a person is] currently or previously displaying an inability to practice nursing as a registered professional nurse, an advanced practice registered nurse, a licensed undergraduate nurse, or a licensed practical nurse with reasonable skill and safety due to use of alcohol, drugs, narcotics, or chemicals.

OCGA § 43-26-53 (a) (8). Assuming, without deciding, that OCGA § 43-26-53 imposed a reporting duty on the defendants, Miller has not shown that they breached that duty because he has not shown a reportable incident.

In *Miller v. Polk*, 363 Ga. App. at 772-773, we described Hamm's history of disciplinary actions before the Alabama and Georgia Boards of Nursing. Hamm was the subject of disciplinary actions before the Alabama Board for failing to disclose a 1998 arrest for driving under the influence; for failing to disclose a 2004 positive pre-employment drug screen for cocaine; for entering guilty pleas in 2013 to driving under the influence and following too closely and a plea of nolo contendere to criminal trespass; for obtaining prescriptions from doctors who were not her primary doctor; for testing positive for a prescription drug that she had not been prescribed; and for

17

failing to satisfy work supervision and reporting requirements. Id. As a result of the Alabama Board proceedings, Hamm was also the subject of disciplinary actions before the Georgia Board. Id. at 773.

In spite of this history, Miller has not pointed to any evidence that Hamm was "convicted of any felony, crime involving moral turpitude, or crime violating a federal or state law relating to controlled substances or dangerous drugs," that would trigger a duty to report under OCGA § 43-26-53 (a) (7). See *Miller v. Polk*, 363 Ga. App. at 772 (describing the 1998 arrest and 2013 conviction for driving under the influence — without specifying the substance of which Hamm was under the influence). Miller has not pointed to any evidence that Hamm displayed or that the defendants were aware that Hamm displayed "an inability to practice nursing . . . with reasonable skill and safety due to use of alcohol, drugs, narcotics, or chemicals," so as to trigger a duty to report under OCGA § 43-26-53 (a) (8).

Miller also argues that the defendants' failure to monitor Hamm amounts to negligence per se, but he fails to cite any statute requiring such monitoring. See generally *R & R Insulation Svcs. v. Royal Indem. Co.*, 307 Ga. App. 419, 424 (1) (705 SE2d 223) (2010) ("[N]egligence per se arises when a statute or ordinance is violated.

18

The violation of certain mandatory regulations may also amount to negligence per se if the regulations impose a legal duty.") (citation and punctuation omitted).

In his reply brief, Miller argues that the defendants committed negligence per se by violating OCGA §§ 43-26-9 (which concerns the renewal of nursing licenses) and 43-34-26.1 (b) (which concerns vaccine protocol agreements). But "this [c]ourt will not consider arguments raised for the first time in a reply brief." *Barron v. Wells Fargo Bank*, 332 Ga. App. 180, 187 (4) (769 SE2d 830) (2015).

4. *Failure to report conduct*

Miller enumerates as error the grant of summary judgment to the defendants on his claim based on their failure to report Hamm's allegedly negligent conduct. But he makes no argument in support of this claim. So we deem it abandoned. Court of Appeals Rule 25 (d) (1).

*Judgment affirmed. Mercier, C. J., and Rickman, J., concur.*